JOHN HANCOCK FINANCIAL SER-
VICES, INC. and John Hancock Life
Insurance Company (Formerly John
Hancock Mutual Life Insurance Compa-
ny), Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 01–543T.

United States Court of Federal Claims.

July 15, 2003.

Matthew J. Zinn, Steptoe & Johnson LLP,
Washington, D.C., with whom were J. Walk-
er Johnson, Steptoe & Johnson LLP, Wash-
ington, D.C., and Theodore R. Groom, Groom
Law Group, Washington, D.C., of counsel, for
plaintiffs.

Sheryl B. Flum, Tax Division, United
States Department of Justice, Washington,
D.C., with whom were, Eileen J. O'Connor,
Assistant Attorney General, and Mildred L.
Seidman, for defendant.

## *OPINION*

MARGOLIS, Senior Judge.

Plaintiff John Hancock Life Insurance
Company, formerly John Hancock Mutual
Life Insurance Company ("John Hancock"),[1]
claims that it is entitled to refunds of
$982,736 and $3,886,617 from the Internal
Revenue Service for tax years 1988 and 1989,
respectively. John Hancock asserts that, for
those tax years, it is entitled to exclude in-
come attributable to the Government's disal-
lowance of additions to its policyholder divi-
dend deductions associated with a negative
recomputed differential earnings amount cal-
culated for tax year 1986, using a formula
prescribed by section 809 of the Internal
Revenue Code ("section 809"). 26 U.S.C.
§ 809. Specifically, John Hancock argues
that the Government's disallowance of addi-
tions to its policyholder dividend deduction
relating to the negative recomputed differen-
tial earnings amount calculated for tax year
1986 resulted in corresponding increases in
income for tax years 1988 and 1989. John
Hancock contends that, under the tax benefit
rule, it is entitled to exclude those increases

---

1. John Hancock Financial Services, Inc., co-
plaintiff in this action, is the common parent and
agent for John Hancock Life Insurance Compa-
ny. For simplicity, the plaintiffs will be collec-
tively referred to as "John Hancock" in this
opinion.

in income because the same data used to calculate its recomputed earnings differential amount for tax year 1986, from which it obtained no tax benefit, were also used as a basis for imputing taxable income to John Hancock for tax years 1988 and 1989. Before the Court are the parties' cross-motions for summary judgment.

## FACTS

John Hancock was, during all relevant periods, a mutual life insurance company. There are generally two business forms of life insurance companies: stock life insurance companies and mutual life insurance companies. Stock life insurance companies are organized as corporations and are owned by stockholders. Mutual life insurance companies, on the other hand, have no stockholders; rather, the companies are basically owned by the policyholders. *CUNA Mut. Life Ins. Co. v. United States*, 169 F.3d 737, 738 (Fed.Cir.1999).

Each year, life insurance companies customarily disburse rebates, referred to as "policyholder dividends,"[2] to their policyholders. Under section 808 of the Internal Revenue Code ("section 808"), life insurance companies are generally permitted to deduct policyholder dividends paid or accrued during the taxable year.[3] "Stockholder dividends," on the other hand, represent earnings distributions by stock life insurance companies to their stockholders and, accordingly, are not deductible. *CUNA*, 169 F.3d at 738.

As mutual life insurance companies are owned by their policyholders, rather than a distinct ownership class of "stockholders," a problem arises with regard to the tax treatment of policyholder dividends disbursed by mutual companies. *Id.* The policyholder divi-

dends paid by mutual companies may include a distribution of earnings, the amount of which is unknown because the policyholder dividends are processed as a single transaction and deducted from income pursuant to section 808. *Id.* Thus, absent any adjustments to their policyholder dividends, mutual life insurance companies may have a tax advantage over stock life insurance companies in being able to deduct payments to their owners that are, in substance, distributions of earnings. *Id.*

In an attempt to level the playing field with respect to the income tax treatment of the two business forms of life insurance companies, in 1984 Congress revised the Internal Revenue Code to set forth new rules requiring mutual life insurance companies to reduce their policyholder dividend deduction distinguishing between stock and mutual company policyholder dividend deductions. *Id.* Under the new tax rules, stock life insurance companies simply deduct policyholder dividends from income, but mutual companies must perform series of complex calculations, set forth in section 809, that are designed to impute that portion of a mutual company's policyholder dividends that constitute a distribution of earnings. *Id.* The mutual company's policyholder dividend deduction is then reduced by the amount estimated to be a distribution of earnings, analogous to a stock company's stockholder dividends.[4] *Id.*

Section 809 imputes income to mutual life insurance companies based on a rolling three-year average of reported earnings of major stock life insurance companies. *Id.*; *Indianapolis Life Ins. Co. v. United States*, 115 F.3d 430, 431 (7th Cir.1997). Section 809 requires mutual life insurance companies to reduce their deductions to reflect an imputed distribution of earnings (differential earnings

---

2. A "policyholder dividend" is "any dividend or similar distribution to policyholders in their capacity as such." 26 U.S.C. § 808(a). Policyholder dividends include "(1) any amount paid or credited (including as an increase in benefits) where the amount is not fixed in the contract but depends on the experience of the company or the discretion of the management, (2) excess interest, (3) premium adjustments, and (4) experience-rated refunds." 26 U.S.C. § 808(b).

3. "Except as limited by paragraph (2), the deduction for policyholder dividends for any taxable year shall be an amount equal to the policyholder dividends paid or accrued during the taxable year." 26 U.S.C. § 808(c)(1).

4. "In the case of a mutual life insurance company, the deduction for policyholder dividends for any taxable year shall be reduced by the amount determined under section 809." 26 U.S.C. § 808(c)(2).

amount) to their policyholders.[5] The rate of imputed stock company return (the imputed earnings rate) is compared with a mutual company rate of return after the payment of policyholder dividends (the average mutual earnings rate), to derive a "differential earnings rate." *CUNA*, 169 F.3d at 738; 26 U.S.C. § 809(c)(1), (d), (e). The differential earnings rate is then multiplied by the particular mutual company's "average equity base," and the resulting "differential earnings amount" is then used to reduce the company's policyholder dividend deduction for the taxable year. *Id.*; 26 U.S.C. § 809(a)(1), (3).

The problem with this methodology arises because data needed to calculate the reduction in mutual companies' policyholder dividends is not available for the current tax year. Thus, Congress devised a two-step process. For the current year, certain prior-year data is used to calculate a rough estimate of the mutual companies. Then, when current data becomes available, a "recomputed differential earnings rate" and a "recomputed differential earnings amount" are calculated. *CUNA*, 169 F.3d at 739; 26 U.S.C. § 809(f)(1), (2), (3). If the differential earnings amount exceeds the recomputed differential earnings amount, the excess is allowed as a "life insurance deduction" in the following year. If the differential earnings amount is less than the recomputed differential earnings amount, the difference is imputed as income for the following taxable year. *CUNA*, 169 F.3d at 739; 26 U.S.C. § 809(f)(1), (2), (3).

In 1986, cyclical fluctuations in earnings rates created an anomaly in the section 809 calculations where the average mutual earnings rate exceeded the imputed earnings rate. The "excess" of the mutual rate over the stock rate resulted in a negative recomputed differential earnings rate and differential earnings amount. The question arose whether this negative recomputed differential earnings rate could serve to increase the policyholder deduction, rather than reduce it. This question was answered in the negative

in *CUNA*, where the Federal Circuit held that the recomputed differential earnings rate could never be less than zero. *CUNA*, 169 F.3d at 742.

John Hancock's action is based on the same essential facts as those in *CUNA*, but is seeking recovery based on a different theory. In *CUNA*, the plaintiff argued that it should be able to increase its 1987 deduction based on the negative recomputed differential earnings rate calculation for 1986. However, while conceding that it cannot increase its 1987 policyholder deduction based on the negative recomputed differential earnings rate, John Hancock argues that, under the "tax benefit rule," it should be able to exclude income for tax years 1988 and 1989 to the extent that the tax benefit that was disallowed for 1986 was used as the basis for imputing income in 1988 and 1989.

## DISCUSSION

The tax benefit rule is a "judicially developed principle that allays some of the inflexibilities of the annual accounting system." *Hillsboro Nat'l Bank v. Commissioner*, 460 U.S. 370, 377, 103 S.Ct. 1134, 75 L.Ed.2d 130 (1983). The tax benefit rule is partially codified in section 111 of the Internal Revenue Code, which states in relevant part: "Gross income does not include income attributable to the recovery during the taxable year of any amount deducted in any prior taxable year to the extent such amount did not reduce the amount of tax imposed by [Chapter 1—Normal Taxes and Surtaxes]." 26 U.S.C. § 111.

The United States Supreme Court observed that "[a]n annual accounting system is a practical necessity if the federal income tax is to produce revenue ascertainable and payable at regular intervals . . . . Nevertheless, strict adherence to an annual accounting system would create transactional inequities." *Hillsboro Nat'l Bank*, 460 U.S. at 377, 103 S.Ct. 1134. Thus, "the basic purpose of the tax benefit rule is to achieve rough transactional parity in tax . . . and to protect the Government and the taxpayer from the ad-

---

5. "In the case of any mutual life insurance company, the amount of the deduction allowed under section 808 [policyholder dividend deduction]

shall be reduced (but not below zero) by the differential earnings amount." 26 U.S.C. § 809(a)(1).

verse effects of reporting a transaction on the basis of assumptions that an event in a subsequent year proves to have been erroneous." *Id.* at 383, 103 S.Ct. 1134.

However, courts must apply the tax benefit rule on a case-by-case basis. *Id.* at 385, 103 S.Ct. 1134. Where "the events giving rise to the tax benefit question are governed by provisions of the [Internal Revenue] Code, there may be an inherent tension between the tax benefit rule and these provisions." *American Mut. Life Ins. Co. v. United States,* 267 F.3d 1344, 1350 (Fed.Cir.2001) ("*American Mutual II*"). When such tension exists, "there is no blanket rule that the tax benefit rule prevails over the particular provisions of the Code at issue." *Id.* Specifically, in determining whether to apply the tax benefit rule to transactions at issue in the instant case, this Court "must undertake an examination of the particular provisions of the Code that govern these transactions to determine whether the deductions taken by the taxpayers were actually inconsistent with later events and whether specific nonrecognition provisions prevail over the principle of the tax benefit rule." *Hillsboro,* 460 U.S. at 390–91, 103 S.Ct. 1134.

John Hancock argues that this Court should apply the tax benefit rule to the transactions at issue because Congress' intended purpose in enacting section 809 was to tax the equity returns of stock and mutual life insurance companies comparably so that, regardless of organizational form, each company would bear an equivalent tax burden. John Hancock points out that, in enacting section 809, Congress' primary goal was "to provide a mechanism for competitive balance between stock and mutual [life insurance] companies which will be dynamic enough to adjust to changes in the industry over time." Staffs of the Joint Committee on Taxation and Senate Committee on Finance, *Major Issues in the Taxation of Life Insurance Products, Policyholders, and Companies,* 10–11 (Jt. Comm. Print 1983).

Additionally, John Hancock asserts that the U.S. Treasury Department has commented that "[t]he tax system should seek to provide a level playing field" for stock and mutual life insurance companies. (Pl.'s App.

at B–33). The Treasury Department also observed that time mismatching problems may arise in the application of section 809 because the recomputed differential earnings rate for a given tax year is calculated "by comparing the average of stock earning rates for the three years preceding the taxable year with the mutual earnings rate for the current taxable year." (Pl.'s App. at B–35). The Treasury Department further opined that [t]his mismatching of years increases the likelihood that the differential earnings rate under section 809 will be inappropriate. *Id.*

John Hancock also cites *Allstate Insurance Co. v. United States,* 936 F.2d 1271 (Fed.Cir.1991), and *California & Hawaiian Sugar Refining Corp. v. United States,* 159 Ct.Cl. 561, 311 F.2d 235 (1962), as being analogous to the facts in the instant case. In *Allstate,* the Federal Circuit applied the tax benefit rule to permit the plaintiff insurance company to exclude subrogation recoveries from income where it had received no tax benefit from the associated prior-period losses. *Allstate,* 936 F.2d at 1275–76. In *California & Hawaiian Sugar,* the Court of Claims held that where the plaintiff had, in a prior period, deducted certain business taxes that were subsequently found to be unconstitutional and, therefore, were refunded to the plaintiff, the refunds were excludable from income because they constituted return of capital, not income. *California & Hawaiian Sugar,* 311 F.2d at 247. Neither *Allstate* nor *California & Hawaiian Sugar* involve exclusion of income associated with previously disallowed deductions, such as the facts in the instant case. None of the cases cited by John Hancock support its conclusion that a deduction claimed, but disallowed, may nevertheless be considered a "deduction" under the tax benefit rule.

Three U.S. Courts of Appeals cases have upheld the Government's disallowance of increased policyholder dividends associated with negative recomputed differential earnings rates: *CUNA; Indianapolis Life;* and *American Mut. Life Ins. Co. v. United States,* 43 F.3d 1172 (8th Cir.1994) ("*American Mutual I*"). John Hancock asserts that it does not dispute these holdings. It con-

tends that its action for application of the tax benefit rule in this case begins with the uncontested assumption that recomputed differential earnings rate can never be less than zero, and that any such negative excess is a disallowed deduction. The Court agrees with the Government, however, that application of the tax benefit rule to allow John Hancock to exclude income associated with such disallowed "deductions" would constitute an "end run" around now well-settled law that disallows recognition of any deduction based on any negative recomputed differential earnings rates calculated under section 809.

The courts in *CUNA, Indianapolis Life*, and *American Mutual I* all based their holdings on their statutory construction of section 809. John Hancock argues that the holdings did not reach the issue of whether timing mechanisms of section 809 result in transactional inequities subject to the tax benefit rule. In CUNA, however, it was held "that § 809(c)(1) unambiguously precludes the use of a 'negative excess' amount to increase the policyholder dividend deduction." *CUNA*, 169 F.3d at 742. Thus, such a statutorily disallowed "negative excess" cannot form the basis for the calculations urged by John Hancock to support its claim for exclusions from income under the tax benefit rule. The Court agrees that this conclusion may result in transactional inequities; however, the remedy John Hancock proposes would circumvent the operation of section 809. As Judge Easterbrook observed in *Indianapolis Life*, "the Internal Revenue Code does not always follow logic." *Indianapolis Life*, 115 F.3d at 434.

■ Moreover, *American Mutual II* supports the proposition that, where deductions are applied to the extent allowed by the statute in the period in which they are taken, they are not deductions that "did not reduce the amount of tax imposed" for purposes of the tax benefit rule and, therefore, cannot be used to exclude income in the current year under the tax benefit rule. 26 U.S.C. § 111. *American Mutual II* involved deductions associated with increases in a mutual life insurance company's reserves, which were required under state law to en-

sure that adequate funds would be available to pay claims. *American Mutual II*, 267 F.3d at 1346. Generally, increases in reserves were deductible from income, and decreases were added to income. *Id.* The plaintiff in *American Mutual II* increased its reserves during a series of years. *Id.* at 1347. Against this backdrop was the company's tax assessment based on underwriting income and investment income. *Id.* At that time, underwriting income was taxable only to the extent that it exceeded investment income. *Id.* The reserve increases operated as deductions to reduce investment income, but the net effect of the deductions on income was only a fraction of the deduction amounts themselves. *Id.* The plaintiff argued that, under the tax benefit rule, it was entitled to exclude income from future reserve decreases to the extent that it was not able to obtain the full tax benefit from the previous reserve increases. *Id.* The court found that any inconsistent tax treatment was attributable to changes in the tax code during the intervening period. *Id.* at 1350. Additionally, the court found that the plaintiff "took the full value of the tax deduction available for reserves under then-applicable law." *Id.* at 1351.

■ Similarly, in the instant case, John Hancock calculated and fully applied its policyholder dividend deduction to the maximum extent allowed by law. As in *American Mutual II*, John Hancock was able to take full lawful value of recomputed differential earnings amounts claimed for 1986. John Hancock may not use recomputed differential earnings amounts not lawfully allowable as tax deductions as the basis for excluding future income. Thus, the disallowed negative excess recomputed differential earnings amount calculated for 1986 is not an "amount deducted in [a] prior taxable year" under 26 U.S.C. § 111.

Additionally, the Court agrees with the Government that the recomputed differential earnings amounts calculated in tax years subsequent to 1986, even though impacted by the 1986 calculations, cannot be considered "recoveries" during those tax years for purposes of the tax benefit rule. While the U.S. Supreme Court has recognized that "a 're-

covery' will not always be necessary to invoke the tax benefit rule," there must be a subsequent "event." *Hillsboro Nat'l Bank,* 460 U.S. at 381, 383, 103 S.Ct. 1134. In the instant case, no "events" occurred subsequent to tax year 1986 that could trigger application of the tax benefit rule, only an imputation of income calculated in accordance with section 809, the same statute used to calculate policyholder dividend deductions allowable for 1986. The Court finds that application of the tax benefit rule as John Hancock suggests would directly conflict with the plain language of the governing statute and, therefore, John Hancock's argument must fail.

### CONCLUSION

For the foregoing reasons, John Hancock's motion for summary judgment is DENIED, and defendant's cross-motion for summary judgment is GRANTED. The Clerk shall enter judgment for the defendant. Costs for the defendant.